IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:21-CV-44-D

| | | |
|---|---|---|
| STEFON ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| KINSTON POLICE OFFICER | ) | |
| JAMES BEST, in his individual | ) | |
| capacity, CITY OF KINSTON, and | ) | |
| CITY OF KINSTON POLICE | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

On April 8, 2021, Stefon Robinson ("Robinson" or "plaintiff") filed this action against

Kinston Police Officer James Best ("Officer Best"), in his individual capacity, the City of Kinston

("Kinston"), and the City of Kinston Police Department ("KPD") (collectively "defendants") alleging

violations of 42 U.S.C. § 1983, assault, battery, intentional infliction of emotional distress, negligent

infliction of emotional distress, and negligence. [D.E. 1]. On December 22, 2022, defendants

moved for summary judgment [D.E. 38] and filed a memorandum [D.E. 39], statement of material

facts [D.E. 40], and appendices [D.E. 41–43] in support. On February 13, 2023, Robinson responded

in opposition [D.E. 46] and submitted a statement of material facts [D.E. 47] and appendix [D.E. 48]

in support. On March 13, 2023, defendants replied to Robinson's statement of material facts [D.E.

51]. As explained below, the court grants defendants' motion for summary judgment.

I.

On Sunday April 8, 2018, at approximately 9:00 a.m., Officer Best received a call from KPD

dispatch to respond to a domestic disturbance at an apartment complex at 912 East Highland Avenue

in Kinston, North Carolina. Defendants' Statement of Material Facts ("DSMF") [D.E. 40] ¶ 9; Plaintiff's Statement of Material Facts ("PSMF") [D.E. 47] ¶ 9. Dispatch informed Officer Best that Tanequea Drake ("Drake") called 911 to report a domestic disturbance at her apartment and said that the suspect was still at Drake's apartment. See DSMF ¶¶ 10, 11; PSMF ¶¶ 10, 11. Officer Best's normal patrol unit, a marked Dodge Charger sedan, was undergoing repairs. Thus, he responded to the call in a marked Ford Explorer SUV vehicle ("Explorer"). See DSMF ¶¶ 7, 8; PSMF ¶¶ 7, 8.

Officer Best was wearing his KPD uniform. As Officer Best approached Drake's apartment, he heard "multiple people yelling, the loudest of which [Officer Best] identified as a male voice." DSMF ¶ 17. Officer Best knocked on the door and five people exited the apartment, including Drake and Robinson. See DSMF ¶ 20; PSMF ¶ 20; Officer Best Bodycam Footage ("Bodycam") Ex. 11 [D.E. 44] 0:30–0:50. When Robinson saw Officer Best, Robinson turned to Drake, pointed at Drake, and asked Drake in a very agitated tone multiple times if she called the police, "yes or no?" See DSMF ¶ 22; PSMF ¶ 22; Bodycam at 0:35–0:40. Officer Best told Drake and Robinson that Officer Best needed to separate them so that he could speak with each of them individually and hear their stories. See DSMF ¶ 35; PSMF ¶ 35; Bodycam at 0:47–0:52.

Officer Best moved away from the apartment and asked Drake to "come talk to me over here." See DSMF ¶ 36; PSMF ¶ 36. Before talking to Drake, Officer Best explained to Robinson multiple times that he was going to first talk to Drake and hear her story and then would talk to Robinson and hear his story. See DSMF ¶¶ 37–40; PSMF ¶¶ 37–40. Officer Best instructed Robinson multiple times to return inside the apartment so that Officer Best could speak to Drake alone. See DSMF ¶¶ 37–41; PSMF ¶¶ 37–41; Bodycam 0:47–1:30. Instead of complying with the order, Robinson remained outside the apartment, exclaiming "[t]his is some bullshit" and "I'm being cooperative." See DSMF ¶¶ 44, 45; PSMF ¶¶ 44, 45; Bodycam 0:55–1:09. In response, Officer Best

2

again asked Robinson to go inside the apartment. See DSMF ¶¶ 46–48; PSMF ¶¶ 46–48; Bodycam 1:06–1:18. Officer Best then told Robinson that he would detain and handcuff Robinson if Robinson did not go inside the apartment. See DSMF ¶¶ 49, 50; PSMF ¶¶ 49, 50; Bodycam 1:18–1:21. In response, Robinson indicated that he was going inside and began to move towards the apartment door. See DSMF ¶¶ 56–58; PSMF ¶¶ 56–58; Bodycam 1:21–1:30.

Once Robinson began moving towards the apartment door, Officer Best turned around, walked back to Drake, and began speaking with Drake about the domestic disturbance call. See DSMF ¶¶ 60, 61; PSMF ¶¶ 60, 61; Bodycam 1:30–1:39. Before Drake could tell Officer Best why she called 911, Drake stopped talking and looked back towards the apartment building. See DSMF ¶ 62; PSMF ¶ 62; Bodycam 1:40. Officer Best looked back towards the apartment building and saw Robinson standing outside, watching Officer Best talk to Drake. See DSMF ¶¶ 63, 64; PSMF ¶¶ 63, 64; Bodycam 1:40–1:42. Officer Best walked back to Robinson, who was standing outside with his arms crossed. See DSMF ¶ 68; PSMF ¶ 68; Bodycam 1:40–1:45.

Officer Best told Robinson that he was going to detain him and repeatedly told him to place his hands behinds his back in order to be handcuffed, but Robinson did not comply. See Bodycam 1:45–2:00. Ultimately, Officer Best pushed Robinson against a railing in order to stop Robinson from moving. See DSMF ¶ 85; PSMF ¶ 85. Robinson still did not put his hands behind his back, but instead grasped the railing with both hands. See DSMF ¶ 92; PSMF ¶ 92; Bodycam 2:00–2:35. Officer Best repeatedly commanded Robinson to let go of the railing and put his hands behind his back. See DSMF ¶¶ 100–06; PSMF ¶¶ 100–06; Bodycam 2:00–2:35. After repeated commands, Officer Best struck Robinson's body with his knee multiple times in an attempt to dislodge Robinson's hands from the railing. See DSMF ¶ 107; PSMF ¶ 107; Bodycam 2:10–2:30. Once

3

Robinson let go of the railing, Officer Best placed Robinson's hands behind his back and put Robinson in handcuffs. See DSMF ¶ 115; PSMF ¶ 115; Bodycam 2:40–3:00.

Officer Best then began walking with Robinson to the Explorer. See DSMF ¶ 117; PSMF ¶ 117; Bodycam 3:44. During the walk, Robinson heckled Officer Best, calling Officer Best "weak," saying that he was "stronger" than Officer Best, and claiming that it was a "female voice," and not Officer Best, that led Robinson to let go of the railing. See DSMF ¶ 126; PSMF ¶ 126; Bodycam 3:48–4:31. Once at the Explorer, Officer Best held Robinson at the back of the Explorer. Officer Best could not put Robinson in the back of the Explorer at that time because Officer Best's canine partner was in the back of the Explorer. See DSMF ¶ 132; PSMF ¶ 132.

The parties disagree about what happened next. Defendants contend that Robinson attempted to pull away from Officer Best, requiring Officer Best to attempt and pull Robinson back towards the Explorer. See DSMF ¶¶ 134–140. Defendants contend that before pulling Robinson back, Officer Best instructed Robinson to "[s]top walking, man!" See id. at ¶ 141. Defendants contend that while attempting to pull Robinson back towards the Explorer in order to immobilize him, Officer Best's left elbow shattered the glass rear windshield of the Explorer thereby cutting Officer Best's left arm, and Robinson and Officer Best then fell to the ground. See id. at ¶¶ 144–46. According to Officer Best, he had used this technique several times with his Dodge Charger to immobilize a resisting detainee. See id. at ¶ 219.

Robinson contends that he was cooperative while walking with Officer Best to the Explorer. See [D.E. 46] 4. Once at the Explorer, Robinson testified that Officer Best paused, then "suddenly slammed Mr. Robinson headfirst into the windshield, smashing the window to bits, and forcing Mr. Robinson's head into the space behind the glass." Id. at 4–5. Robinson alleges that Officer Best told Robinson to stop walking after slamming Robinson's head through the rear window. See id. at 5.

4

Officer Best allegedly injured his left elbow on the broken glass as Officer Best was pulling Robinson from the Explorer. See id. Robinson alleges that Officer Best then "took [him] to the ground" where Robinson landed on glass shards. See id.

Consistent with Scott v. Harris, 550 U.S. 372, 378–81 (2007), and its progeny, this court has reviewed Officer Best's bodycam video.[1] Officer Best's bodycam video shows Officer Best walking with Robinson towards the Explorer. Robinson is handcuffed with his hands behind his back, and they are talking. Robinson is very agitated. As they arrive at the Explorer, the bodycam video shows Robinson (who is facing away from Officer Best) pull away from Officer Best, and Officer Best pull Robinson back towards Officer Best and the Explorer. The bodycam video then shows the glass of the back of the Explorer breaking, Robinson and Officer Best falling to the ground, Officer Best standing up with a bleeding left arm, and Robinson repeatedly saying "fuck you" to Officer Best. Officer Best then repeatedly told Robinson to calm down and requested assistance.

The bodycam video does not show Officer Best slamming Robinson's head through the rear window of the Explorer or injuring his left elbow on the broken glass as he was pulling Robinson from the Explorer. The bodycam video also does not show any injury to Robinson's face or head. The bodycam video does show cuts on Robinson's right leg, which arose due to the fall to the ground and the glass shards on the ground.

After KPD backup arrived, another KPD police officer drove Robinson to the police station, and Officer Best received treatment for bleeding on his left elbow. See DSMF ¶¶ 180, 186; PSMF ¶¶ 180, 186; Bodycam 6:26–6:43. At the police station, Robinson voluntarily slammed his head

---

[1] In Harris v. Pittman, 927 F.3d 266 (4th Cir. 2019), the Fourth Circuit discussed Scott, and held that "[s]ummary judgment is proper under Scott only when there is evidence—like the videotape in Scott itself—of undisputed authenticity that shows some material element of the plaintiff's account to be 'blatantly and demonstrably false.'" Id. at 276. This court has applied Harris's interpretation of Scott.

5

against a metal gate twice when speaking with Officer Harrison. See DSMF ¶ 263; PSMF ¶ 263; Bodycam Footage ("Bodycam 2") Exhibit 12 [D.E. 44] 11:44–11:46. KPD took Robinson to Lenoir Memorial Hospital, where staff treated him for cuts on his right leg. See DSMF ¶¶ 269, 271; PSMF ¶¶ 269, 271; [D.E. 42-4] 1, 4, 6. Although Robinson reported head pain, a CT scan came back normal and atraumatic, and Robinson had no major lacerations on his head or face. See DSMF ¶¶ 280, 283; PSMF ¶¶ 280, 283. Hospital staff diagnosed Robinson with a concussion. See DSMF ¶ 286; PSMF ¶ 286. Robinson was charged with a class 2 misdemeanor of resist, obstruct, and delay in violation of N.C. Gen. Stat. § 14-223.

Robinson was convicted in Lenoir County District Court of violating N.C. Gen. Stat. § 14-223. See DSMF ¶ 320; PSMF ¶ 320. Robinson appealed to Lenoir County Superior Court, and the Lenoir District Attorney dismissed the charge. See DSMF ¶ 321; PSMF ¶ 321.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott, 550 U.S. at 378–86; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making

6

this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

## A.

Defendants move for summary judgment on Robinson's unreasonable seizure claim under 42 U.S.C. § 1983. Defendants argue that no genuine issue of material fact exists concerning whether Officer Best had probable cause to believe Robinson had violated N.C. Gen. Stat. § 14-223 when Officer Best seized Robinson in order to put him in handcuffs. See [D.E. 39] 5–11. Robinson responds that "any resistance, delay, or obstruction that took place after Officer Best decided to arrest Mr. Robinson and place him in handcuffs is irrelevant" and that Robinson's conduct before Officer Best's decision to arrest him does not satisfy N.C. Gen. Stat. § 14-223. See [D.E. 46] 8–12.

"A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003). To prevail on a section 1983 claim alleging a violation of the Fourth Amendment due to an unlawful arrest, a plaintiff must demonstrate that the arrest was not supported by probable cause. See, e.g., Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir. 2007).

7

"To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Dist. of Columbia v. Wesby, 583 U.S. 48, 56–57 (2018) (quotations omitted); see Pringle, 540 U.S. at 371; Ornelas v. United States, 417 U.S. 690, 696 (1996); Beck v. Ohio, 379 U.S. 89, 91 (1964); Wilson v. Kittoe, 337 F.3d 392, 398 (4th Cir. 2003). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." Wesby, 583 U.S. at 57 (quotations omitted); see Pringle, 540 U.S. at 371; Illinois v. Gates, 462 U.S. 213, 241–46 (1983); United States v. Dickey-Bey, 393 F.3d 449, 454 (4th Cir. 2004); Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir. 1998). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Pringle, 540 U.S. at 370 (quotations omitted); see Ornelas, 517 U.S. at 695; Dickey-Bey, 393 F.3d at 453–54; Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002). In evaluating objective reasonableness, what the police officer observed is highly relevant; the police officer's subjective beliefs are not. See, e.g., Devenpeck v. Alford, 543 U.S. 146, 153 (2004). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Wesby, 583 U.S. at 57 (quotation omitted); Gates, 462 U.S. at 243–44, 243 n.13. "Probable cause is not a high bar." Wesby, 583 U.S. at 57 (quotation omitted).

Under section 14-223, "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 14-223. The elements of the offense are:

1) that the victim was a public officer;

8

2) that the [arrestee] knew or had reasonable grounds to believe that the victim was a public officer;

3) that the victim was discharging or attempting to discharge a duty of his office;

4) that the [arrestee] resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and

5) that the [arrestee] acted willfully and unlawfully, that is intentionally and without justification or excuse.

State v. Sinclair, 191 N.C. App. 485, 488–89, 663 S.E.2d 866, 870 (2008). Section 14-223 seeks "to enforce orderly conduct in the important mission of preserving the peace . . . and upholding the dignity of the law." State v. Leigh, 278 N.C. 243, 251, 179 S.E.2d 708, 713 (1971). The statute "is concerned with acts threatening a public officer with injury only insofar as they interfere with the performance of his official duties." State v. Hardy, 298 N.C. 191, 197, 257 S.E.2d 426, 430 (1979).

"[M]erely remonstrating with an officer . . . or criticizing or questioning an officer while he is performing his duty, when done in an orderly manner, does not amount to obstructing or delaying an officer in the performance of his duties." Leigh, 278 N.C. at 251, 179 S.E.2d at 713; see State v. Singletary, 73 N.C. App. 612, 615, 327 S.E.2d 11, 13 (1985); State v. Allen, 14 N.C. App. 485, 491, 188 S.E.2d 568, 573 (1972). Section 14-223 does not apply to "communications simply intended to assert rights, seek clarification or obtain information in a peaceful way." Burton v. City of Durham, 118 N.C. App. 676, 681, 457 S.E.2d 329, 332 (1995). "Only those communications intended to hinder or prevent an officer from carrying out his duty are discouraged by [N.C. Gen. Stat. § 14-223]." Id., 457 S.E.2d at 332. An individual need not engage in physical violence or permanently impede an officer's duties in order to violate N.C. Gen. Stat. § 14-223. See State v. Burton, 108 N.C. App. 219, 225, 423 S.E.2d 484, 488 (1992).

9

Robinson argues that he took "no action, willful or otherwise, to impede or obstruct Officer Best's investigation." [D.E. 46] 11. Robinson contends that he simply asked Drake who called the police, questioned Officer Best about what the problem was, questioned Officer Best's authority to order Robinson into the apartment, and stood outside attempting to watch Officer Best speak to Drake. See id.

Even viewing the evidence in the light most favorable to Robinson, Officer Best's bodycam video shows that Robinson did much more than simply "assert rights, seek clarification or obtain information in a peaceful way." Burton, 118 N.C. App. at 681, 457 S.E.2d at 332. Robinson's conduct at Drake's apartment gave Officer Best probable cause to believe that Robinson "resisted, delayed, or obstructed [Officer Best] in discharging or attempting to discharge a duty of his office." N.C. Gen. Stat. § 14-223. Officer Best was a police officer, and Robinson had reasonable grounds to believe that Officer Best was a police officer based on his uniform, Drake's admission that she had called the police, and Robinson's statements that Officer Best was a police officer. Moreover, Officer Best told Robinson and Drake that he needed to speak with them separately in order to investigate the domestic disturbance call. See DSMF ¶¶ 37–40; PSMF ¶¶ 37–40; Bodycam 0:47–1:31. Officer Best repeatedly told Robinson that he would speak with Drake alone first to hear her story and then speak with Robinson alone to hear his story. Officer Best repeatedly instructed Robinson to go back inside the apartment, but Robinson willfully refused the orders. See DSMF ¶¶ 37–45; PSMF ¶¶ 37–45; Bodycam 0:47–1:44. Additionally, Robinson directly interfered with Officer Best's attempts to investigate the domestic disturbance call by speaking with Drake and ignored Officer Best's orders. Robinson's willful and unlawful conduct delayed and obstructed Officer Best's attempt to discharge the duties of his office. See DSMF ¶¶ 60–68; PSMF ¶¶ 60–68; Bodycam 0:47–1:44. Even if Robinson simply wanted to hear what Drake was saying to Officer

10

Best, Robinson willfully and unlawfully ignored Officer Best's orders and prevented Drake from speaking with Officer Best as he investigated the domestic disturbance call and thereby created probable cause to believe that Robinson violated N.C. Gen. Stat. § 14-223.

In opposition, Robinson argues that standing outside the apartment with his arms crossed and listening to Officer Best and Drake discuss the domestic disturbance call did not interfere with the investigation. Robinson's argument, however, ignores the context. Given the domestic disturbance call, the significant size difference between Drake and Robinson, and Robinson's agitated state, it was objectively reasonable for Officer Best to believe that Drake would not be as forthcoming with Officer Best during the investigation if Robinson was in Drake's line of sight or earshot. Given this context, Robinson's actions constituted not only a repeated violation of Officer Best's orders, but also interference with Officer Best's attempts to speak with Drake as part of Officer Best's investigation. Even viewing the totality of the circumstances of Officer Best's interaction with Robinson in the light most favorable to Robinson, Officer Best had probable cause to arrest Robinson for violating N.C. Gen. Stat. § 14-223 before he seized Robinson. See, e.g., Wesby, 583 U.S. at 57. Thus, the court grants defendants' motion for summary judgment on Robinson's section 1983 unreasonable seizure claim.

### B.

Defendants move for summary judgment on Robinson's excessive force claim under 42 U.S.C. § 1983. Robinson contends that Officer Best's knee strikes to Robinson's body at Drake's apartment in order to place Robinson in handcuffs constitutes excessive force under the Fourth Amendment. See [D.E. 1] ¶¶ 30–40. Robinson also contends that Officer Best used excessive force under the Fourth Amendment at the Explorer. See id.; [D.E. 46] 13.

11

The Fourth Amendment protects citizens from excessive force during arrest. See, e.g., Graham v. Connor, 490 U.S. 386, 395 (1989); Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009); Young v. Prince George's Cnty., 355 F.3d 751, 758 (4th Cir. 2004); Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). To determine whether an officer's use of force was excessive, the court employs a "reasonableness" test. See, e.g., Graham, 490 U.S. at 396; Valladares, 552 F.3d at 388. The court examines the objective reasonableness of the officer's actions, rather than the subjective motivations of the officer. See, e.g., Graham, 490 U.S. at 397; Young, 355 F.3d at 756–57; Jones, 325 F.3d at 527.

The reasonableness test under the Fourth Amendment is not "capable of precise definition" or mechanical application. Bell v. Wolfish, 441 U.S. 520, 559 (1979). The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009) (quoting Young, 355 F.3d at 757). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396. The court must carefully examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. The court also may consider the extent of the plaintiff's injury. See Jones, 325 F.3d at 527. In evaluating these factors, the court must not engage in Monday-morning quarterbacking, but instead must assess the reasonableness of the officer's actions based on the information possessed by the officer "immediately prior to and at the very moment" that the officer employed the force. Betton v. Belue, 942 F.3d 184, 191 (4th Cir. 2019) (quotation

12

omitted); see Graham, 490 U.S. at 396–97; Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005); Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 613 (E.D.N.C. 2009).

In seeking summary judgment, defendants argue that Officer Best's use of knee strikes on Robinson's body at Drake's apartment was reasonable under the circumstances in order to arrest Robinson. See [D.E. 39] 13. Robinson does not address the knee strikes in his memorandum in opposition. Thus, Robinson appears to have abandoned this issue. Nonetheless, the court is obligated to "review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." Robinson v. Wix Filtration Corp., 599 F.3d 403, 409 n.8 (4th Cir. 2010) (quotation omitted); Maryland v. Universal Elections, Inc., 729 F.3d 370, 380 (4th Cir. 2013); Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).

Even viewing the evidence in light most favorable to Robinson, Officer Best's use of knee strikes was reasonable under the circumstances. Robinson repeatedly and actively ignored Officer Best's orders to put his hands behind his back and resisted arrest by grabbing a nearby railing and refusing to let go. See DSMF ¶¶ 79–85; PSMF ¶¶ 79–85; Bodycam 1:45–2:35. Robinson also ignored Officer Best's oral commands to release the railing and put his hands behind his back. See DSMF ¶¶ 100–06; PSMF ¶¶ 100–06; Bodycam 1:45–2:35. Only after the knee strikes to Robinson's body did Robinson release the rail and submit to arrest. See DSMF ¶ 107; PSMF ¶ 107; Bodycam 2:33–2:44. Moreover, Robinson admitted that Officer Best used only light force when applying the knee strikes, commenting that Officer Best was "weak." See DSMF ¶ 126; PSMF ¶ 126; Bodycam 3:48–4:31. Robinson also noted that he was "stronger" than Officer Best and that a "female voice" telling Robinson to act reasonably, not Officer Best's use of force, made Robinson release the

13

railing. Bodycam 3:48–4:31. In light of the totality of the circumstances surrounding the knee strikes, Officer Best's use of force by applying knee strikes to Robinson's body was reasonable under the circumstances. Thus, the court grants defendants' motion for summary judgment on the excessive force claim regarding the knee strikes. See, e.g., Graham, 490 U.S. at 396–97.

As for the use of force at the Explorer, the court proceeds directly to the parties' arguments about qualified immunity. See Wesby, 583 U.S. at 62 n.7; Camreta v. Greene, 563 U.S. 692, 707 (2011); Pearson v. Callahan, 555 U.S. 223, 236 (2009); King v. Riley, ___ F.4th ___, 2023 WL 4982353, at *3 (4th Cir. Aug. 4, 2023). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see City of Escondido v. Emmons, 139 S. Ct. 500, 503–04 (2019) (per curiam); Kisela v. Hughes, 138 S. Ct. 1148, 1152–55 (2018) (per curiam); Wesby, 583 U.S. at 63; Hernandez v. Mesa, 582 U.S. 548, 554 (2017); Ziglar v. Abbasi, 582 U.S. 120, 150–51 (2017); King, 2023 WL 4982353, at *4–6; Sharpe v. Winterville Police Dep't, 59 F.4th 674, 682–84 (4th Cir. 2023); Burns-Fisher v. Romero-Lehrer, 57 F.4th 421, 424 (4th Cir. 2023); Tobey v. Jones, 706 F.3d 379, 385 (4th Cir. 2013).[5] Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Kisela, 138 S. Ct at 1152.

In analyzing qualified immunity, the court asks (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Pearson, 555 U.S. at

---

[5] The court recognizes the current state of qualified immunity doctrine and the debate about whether the Supreme Court or Congress should change it. See, e.g., Sharpe, 59 F.4th at 684 n.12. As a lower court, however, this court must follow binding precedent. See id.

232 (quotations omitted); see Wood v. Moss, 572 U.S. 744, 757 (2014); Knibbs v. Momphard, 30 F.4th 200, 214 (4th Cir. 2022); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (cleaned up); see Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 7 (2021) (per curiam); King, 2023 WL 4982353, at *3; Sharpe, 59 F.4th at 682–84. Although a case need not be directly controlling, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see Rivas-Villegas, 142 S. Ct. at 7–8; King, 2023 WL 4982353, at *4–6; Sharpe, 59 F.4th at 682–84.

To determine whether an officer's conduct violates clearly established law, a court must first specifically define the right. See, e.g., City of Tahlequah v. Bond, 142 S. Ct. 9, 11 (2021) (per curiam). "Such specificity is especially important in the Fourth Amendment context where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Id. (quotation omitted). Then, based on that specifically defined right, the court must determine whether existing precedent placed the statutory or constitutional question "beyond debate." Kisela, 138 S. Ct. at 1152. "It is not enough that the rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Bond, 142 S. Ct. at 11 (quotation omitted); Wesby, 583 U.S. at 63. An officer is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." Kisela, 138 S. Ct. at 1152 (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam)); Wesby, 583 U.S. at 63-66.

15

The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." Wesby, 583 U.S. at 66 n.8; see Kisela, 138 S. Ct. at 1152–54; Taylor v. Barkes, 575 U.S. 822, 825–27 (2015) (per curiam); City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 613–14 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam). In the Fourth Circuit, "existing precedent" includes precedent of the United States Supreme Court, the Fourth Circuit, and the highest court of the state in which the action arose. See Doe ex rel. Johnson, 597 F.3d at 176. It also includes "a consensus of persuasive authority from other jurisdictions." Sharpe, 59 F.4th at 683.

In Pearson, the Supreme Court held that the qualified-immunity analysis need not proceed in a particular sequence, and that "[t]he judges of the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236; King, 2023 WL 4982353, at *3. Qualified immunity shields a defendant if the answer to either prong is "no." See al-Kidd, 563 U.S. at 735; Miller, 475 F.3d at 627; Bostic, 667 F. Supp. 2d at 605–06.

Defendants argue that even if Officer Best incorrectly believed that Robinson was resisting arrest, Robinson was a threat to Officer Best's safety, or that Robinson was attempting to flee, that "in light of the legal landscape with regard to the application of force to restrain uncooperative subjects, it would not have been clear to a reasonable officer in Officer Best's shoes [on April 8, 2018,] that his conduct was unconstitutional." [D.E. 39] 25. Defendants also argue that Officer Best "should not be held liable if he made 'bad guesses in gray areas,' and his conduct fell short of 'transgressing bright lines.'" Id. (quoting Waterman, 393 F.3d at 476).

Robinson responds that qualified immunity does not apply because genuine issues of material fact exist concerning whether Robinson was attempting to flee and whether Robinson's head or

16

Officer Best's elbow shattered the Explorer's rear windshield. Robinson contends that on the day of Robinson's arrest, caselaw had clearly established that "it was unlawful for an officer to slam a handcuffed arrestee headfirst through the back of an SUV windshield." [D.E. 46] 15. In support, Robinson cites Valladares, 552 F.3d at 390–91, Buchanan, 325 F.3d at 520, Kane v. Hargis, 987 F.2d 1005, 1006–07 (4th Cir. 1993) (per curiam), and Dean v. Jones, 984 F.3d 295 (4th Cir. 2021). See [D.E. 46] 15–16.

Even viewing the evidence in light most favorable to Robinson, Officer Best's conduct on April 8, 2018, did not violate Robinson's clearly established Fourth Amendment rights. As discussed, Officer Best's bodycam video shows Officer Best walking with Robinson towards the Explorer. Robinson is handcuffed with his hands behind his back, and they are talking. Robinson is very agitated. As they arrive at the Explorer, the bodycam video shows Robinson pull away from Officer Best, and Officer Best pull Robinson back towards Officer Best and the Explorer. The bodycam video then shows the glass of the back of the Explorer breaking, Robinson and Officer Best falling to the ground, Officer Best standing up with a bleeding left arm, and Robinson repeatedly saying "fuck you" to Officer Best. The bodycam video does not show any injury to Robinson's face or head.[6] Officer Best did not apply any additional force, repeatedly told Robinson to calm down, and requested assistance.

An officer enjoys qualified immunity and is not liable for excessive force unless he has violated a "clearly established" right, such that "it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Kingsley v. Hendrickson, 576 U.S.

---

[6] Photographs of Robinson at the KPD police station taken immediately after the incident show that Robinson had no cuts or bleeding on his face. See [D.E. 42-4] 1, 6. While photographs show cuts on Robinson's right leg, Robinson's right leg did not go through the Explorer's window. See id. at 4. Robinson obviously sustained the cuts on his right leg due to the fall.

17

389, 400 (2015). Courts must evaluate qualified immunity knowing that officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 397. Given the undisputed facts in the bodycam video concerning the use of force at the Explorer, a reasonable officer in Officer Best's position would not have clearly known that the force that Officer Best used against Robinson at that moment violated Robinson's clearly established Fourth Amendment rights.

Officer Best was alone at the scene of a domestic disturbance call. Officer Best had just detained Robinson, a man larger than Officer Best. Robinson was agitated about the domestic disturbance call, had just physically resisted arrest for resisting, delaying, or obstructing an investigation, and required knee strikes in order to place him in handcuffs. Although Robinson did not resist Officer Best while walking to the Explorer, Robinson remained agitated during the walk. When Officer Best paused at the Explorer, Robinson pulled away from the Explorer and Officer Best and towards an unknown destination. Only after Robinson pulled away from Officer Best and the Explorer did Officer Best apply force, and the force that he applied was reasonable under the circumstances. The force involved pulling Robinson towards the Explorer and attempting to use the Explorer to immobilize Robinson. As part of that process, the rear window of the Explorer broke, Officer Best cut his left arm, and both men fell to the ground. Officer Best then stood up and called for assistance. Officer Best applied no more force to Robinson after Officer Best stood up and Robinson remained on the ground.

Under these circumstances, a reasonable officer on April 8, 2018, would not have known that the amount and type of force that Officer Best used on Robinson violated Robinson's clearly established Fourth Amendment rights. Officer Best pulled Robinson strongly enough towards the Explorer for the glass on the rear window to break and to cut Officer Best's left arm, but Officer Best

18

had to act quickly when Robinson pulled away from him and the Explorer. In light of Robinson's prior resistance to arrest, larger size, and agitated state, Officer Best knew that gentle force would not allow Officer Best to control Robinson. Indeed, Robinson explicitly told Officer Best that Officer Best's knee strikes at the apartment were ineffective and did not lead Robinson to submit to arrest or to comply with Officer Best's orders. See DSMF ¶ 126; PSMF ¶ 126; Bodycam 3:48–4:31. Although Robinson was in handcuffs as they approached the Explorer, Robinson had full use of his legs and was not stationary or secure. Therefore, even viewing the use of force and context in light most favorable to Robinson, Officer Best's use of force did not violate Robinson's clearly established rights under the Fourth Amendment. See, e.g., Bond, 142 S. Ct. at 11; Graham, 490 U.S. at 396–97; Craig v. Martin, 49 F.4th 404, 411–12 (5th Cir. 2022) (holding that a police officer who took a resisting handcuffed suspect to the ground and then stood up and kicked her in the leg in order to put her into a police car did not constitute excessive force); Mason v. Las Vegas Metro. Police Dep't, 754 F. App'x 559, 562 (9th Cir. 2019) (unpublished) (holding that a police officer's use of force against a handcuffed suspect who resisted arrest did not constitute excessive force where the detainee appeared to the officer to attempt to head-butt the officer and kick the officer and the officer responded by pushing the detainee back down on a table with sufficient force that the detainee received mouth and facial injuries when her face hit and broke the glass on the table); Salway v. Norris, No. 2:20-CV-115, 2021 WL 2953668, at *5–6 (D. Wyo. July 14, 2021), aff'd, No. 21-8055, 2023 WL 1155868 (10th Cir. Jan. 31, 2023) (holding that a police officer striking a handcuffed suspect twice in the face did not constitute excessive force where the detainee continued kicking and screaming while detained); Devoe v. Rebant, No. 05–71863, 2006 WL 334297, at *6–7 (E.D. Mich. Feb. 13, 2006) (unpublished) (holding that a police officer's use of a single drive stun from his taser

19

to a handcuffed suspect's lower back after the subject refused eleven times to get into the police car did not constitute excessive force).

In opposition, Robinson argues that Officer Best used unnecessary, gratuitous, and disproportionate force on a secured, unarmed citizen, and thereby violated Robinson's clearly established rights under the Fourth Amendment. In support, Robinson cites Buchanan, Valladares, Kane, and Dean. See Buchanan, 325 F.3d at 527–32 (holding that an officer was not entitled to qualified immunity when he knocked down and jumped on a detainee thereby breaking the detainee's nose, lacerating his face, and bruising his ribs where the detainee was "drunk and using foul language, was unarmed, handcuffed, and alone in a secured room in the sheriff's headquarters"); Valladares, 552 F.3d at 390 (holding that a 250-pound officer was not entitled to qualified immunity when the officer gained control of a 135-pound 15-year old boy, but then picked up the boy and twice slammed the non-resisting boy onto the hood of a car and broke his jaw); Kane, 987 F.2d at 1006–08 (holding that a 200-pound male officer was not entitled to qualified immunity when he pinned a 100-pound woman detainee to the ground, but then repeatedly slammed her face into the pavement thereby cracking three of her teeth, cutting her nose, and bruising her face; the woman was already detained and not resisting arrest when the officer used the additional force and repeatedly slammed the woman's face into the pavement); Dean, 984 F.3d at 306–08 (holding that a correctional officer was not entitled to qualified immunity where the officer had his knee on the inmate's chest and directly blasted pepper spray into the face of the completely restrained and non-resisting inmate who was on the ground with his hands cuffed behind him).

The facts of this case are distinguishable from Buchanan, Valladares, Kane, and Dean. As for Buchanan, unlike in Buchanan, Robinson was not secured in a police station when Officer Best

20

applied force. See Buchanan, 325 F.3d at 527. Moreover, the injuries in this case are not similar. See id.

As for Kane, unlike the male officer in Kane who pinned down a detained woman less than half his size and then repeatedly slammed her face into the pavement thereby cracking three of her teeth, cutting her nose, and bruising her face, Robinson was a larger and stronger man than Officer Best, had just successfully resisted multiple knee strikes from Officer Best, and was not under Officer Best's control at the time Officer Best used force. See Kane, 987 F.2d at 1006–07. Moreover, unlike in Kane, Officer Best used reasonable force to restrain Robinson and no additional force on Robinson once they fell to the ground. Instead, Officer Best stood up and called for assistance. See id. Furthermore, Robinson did not sustain similar injuries to those in Kane. See id.

As for Valladares, in that case a five-foot-three inches tall 15-year old boy, who weighed 130 pounds and was not handcuffed, shoved an officer while attempting to intervene in a dispute between the officer and the boy's drunk 25-year old brother. See Valladares, 552 F.3d at 387. The officer, who was six-foot-two-inches tall and weighed 250 pounds, responded by swinging the 15-year old boy into a car, resulting in the boy falling to the ground. See id. at 387, 390. That use of force was not excessive and immobilized the boy. See id. at 390. The officer, however, then picked the boy up off the ground, had the boy "under full control," stood the boy on his feet, and slammed the boy's head into the car twice, eventually breaking his jaw. Id. That additional use of force was sufficient to sustain a claim of excessive force. See id. at 390–91.

Unlike in Valladares, Robinson (a man larger than Officer Best) was not "under full control" at the Explorer when he pulled away from Officer Best. In order to regain control, Officer Best then pulled Robinson back towards Officer Best and the Explorer to immobilize Robinson. As part of Officer Best's use of force, the glass of the back of the Explorer broke, Officer Best cut his left arm,

21

Robinson and Officer Best fell to the ground, and Officer Best then stood up. Officer Best's left arm was bleeding, and Robinson was still on the ground repeatedly yelling "fuck you" to Officer Best. The bodycam video does not show any injury to Robinson's face or head. Officer Best then repeatedly told Robinson to calm down and requested assistance. Unlike in Valladares, when Robinson fell to the ground, fully surrendered, and stopped resisting, Officer Best stood up and did not continue to apply force. Furthermore, Robinson's injuries are not similar to those in Valladares. Therefore, Valladares does not help Robinson.

As for Dean, the inmate's excessive force claim involved a correctional officer using additional force in the form of directly blasting pepper spray into the inmates's face after the inmate was on the ground, the officer had his knee on the inmate's chest, and the inmate was "completely restrained and not resisting." Dean, 984 F.3d at 306. In this case, however, Robinson was not completely restrained, subdued, or on the ground when Officer Best used force to regain control of Robinson. Moreover, in Dean, the Fourth Circuit observed that qualified immunity was not available to the correctional officer who used the pepper spray because it was clearly established law under the Eighth Amendment at that time that a "correctional officer uses excessive force if he maliciously uses force against an inmate who has been subdued, even if force might have been justified to control the inmate only moments before." Id. at 310. Here, assuming without deciding that Eighth Amendment excessive force precedent applies to Robinson's Fourth Amendment claim, qualified immunity applies because the force that Officer Best applied was reasonable and proportionate and designed to subdue and control Robinson, as evidenced by the body camera footage. Furthermore, unlike the correctional officer in Dean, Officer Best applied no more force once Robinson was subdued and not resisting on the ground.

22

Ultimately, even viewing the evidence in the light most favorable to Robinson, "existing precedent" did not put the legality of Officer Best's use of force on April 8, 2018, "beyond debate" under the Fourth Amendment. See al-Kidd, 563 U.S. at 741; Bond, 142 S. Ct. at 11; Rivas-Villegas, 142 S. Ct. at 7–8. Therefore, qualified immunity bars Robinson's excessive force claim regarding Officer Best's use of force near the Explorer. See, e.g., Bond, 142 S. Ct. at 11; Graham, 490 U.S. at 396–97; Craig, 49 F.4th at 411–12; Mason, 754 F. App'x at 562; Salway, 2021 WL 2953668, at *5–6; Devoe, 2006 WL 334297, at *6–7.

## C.

Defendants move for summary judgment on Robinson's claims against defendant KPD and his section 1983 claim against the City of Kinston. Robinson did not respond in opposition to this issue. Nonetheless, the court analyzes whether defendants are entitled to summary judgment. See Robinson, 599 F.3d at 409 n.8.

As for the KPD, state law determines the capacity of a state governmental body to be sued in federal court. See Avery v. Burke Cnty., 660 F.2d 111, 113–14 (4th Cir. 1981). Accordingly, this court must predict how the Supreme Court of North Carolina would rule on such a state law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Stahle v. CTS Corp., 817 F.3d 96, 99–100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398

23

(4th Cir. 2013) (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

A North Carolina county is a legal entity which may be sued under certain circumstances. See N.C. Gen. Stat. § 153A-11. Likewise, a North Carolina city or town is a legal entity which may be sued under certain circumstances. See N.C. Gen. Stat. § 160A-485; see also id. § 160A-1(2) (noting that "'[c]ity' is interchangeable with the terms 'town'" for purposes of section 160A). There is no corresponding statute, however, authorizing suit against a North Carolina county police department or town police department. See, e.g., Parker v. Bladen Cnty., 583 F. Supp. 2d 736, 740 (E.D.N.C. 2008); Moore v. City of Asheville, 290 F. Supp. 2d 664, 673 (W.D.N.C. 2003), aff'd, 396 F.3d 385 (4th Cir. 2005); Coleman v. Cooper, 89 N.C. App. 188, 192, 366 S.E.2d 2, 5, disc. review denied, 322 N.C. 834, 371 S.E.2d 275 (1988), overruled in part on other grounds by Meyer v. Walls, 347 N.C. 97, 489 S.E.2d 880 (1997). Accordingly, the court grants summary judgment to KPD and dismisses KPD as a defendant.

As for the City of Kinston, municipal entities cannot be held liable under section 1983 solely because they employed a tortfeasor. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Hafer v. Melo, 502 U.S. 21, 25 (1991); King, 2023 WL 4982353, at *7. Rather, when a plaintiff sues a municipal entity—directly or in an official-capacity suit—a plaintiff must plausibly allege that a "policy or custom" attributable to the municipal entity caused the violation of the plaintiff's federally protected rights. Hafer, 502 U.S. at 25; Kentucky v. Graham, 473 U.S. 159, 166 (1985);

24

Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 691–92 (1978); King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016); Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 402 (4th Cir. 2014); Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 45, 469–70 (4th Cir. 2013); Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003); Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). There are four ways in which a plaintiff can establish municipal liability for a policy or custom:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

Lytle, 326 F.3d at 471 (cleaned up).

A violation results from a municipal entity's policy or custom if the violation resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690; see City of St. Louis v. Praprotnik, 485 U.S. 112, 121–22 (1988). Even if a section 1983 plaintiff can identify the requisite final policymaking authority under state law, however, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." Riddick v. Sch. Bd., 238 F.3d 518, 524 (4th Cir. 2000). Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Id. (quoting Bryan Cnty., 520 U.S. at 404) (emphasis omitted); see City of Canton v. Harris, 489 U.S. 378, 389–90 (1989). Thus, a section 1983 plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Bryan Cnty., 520 U.S. at 411; see Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218–19.

25

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction. Bryan Cnty., 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite culpability, a section 1983 plaintiff also must show "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404. Thus, deliberate indifference and causation are separate requirements. See id.

Not every municipal official's action or inaction represents municipal policy. Rather, the inquiry focuses on whether the municipal official possessed final policymaking authority under state law concerning the action or inaction. See, e.g., McMillian v. Monroe Cnty., 520 U.S. 781, 785–86 (1997); Pembaur v. City of Cincinnati, 475 U.S. 469, 482 (1986); Riddick, 238 F.3d at 523.

Robinson's section 1983 claims against the City of Kinston stem from Officer Best's conduct. Robinson, however, has failed to present evidence that the City of Kinston enacted a "policy or custom" that led to the alleged constitutional violations against Robinson. Robinson also has not produced evidence attributing alleged constitutional violations or toritous conduct to the City of Kinston. See McMillian, 520 U.S. at 785–86; Pembaur, 475 U.S. at 482; Riddick, 238 F.3d at 523. Thus, the court grants summary judgment to the City of Kinston on Robinson's section 1983 claims.

### D.

Defendants move for summary judgment on Robinson's state law tort claims based on the North Carolina doctrine of public-officer immunity. The public-officer immunity standard under North Carolina law diverges from the qualified-immunity standard under section 1983. See Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 335 (4th Cir. 2009); Bostic, 667

26

F. Supp. 2d at 605; Andrews v. Crump, 144 N.C. App. 68, 76, 547 S.E.2d 117, 123 (2001). Under North Carolina law,

> a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto. The rule in such cases is that an official may not be held liable unless it be alleged and proved that his act, or failure to act, was corrupt or malicious, or that he acted outside of and beyond the scope of his duties.

Meyer v. Walls, 347 N.C. 97, 112, 489 S.E.2d 880, 888 (1997). "As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." Smith v. State, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976). A public officer "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). The act must be "done of wicked purpose, or . . . done needlessly, manifesting a reckless indifference to the rights of others." Id. at 313, 321 S.E.2d at 891 (quotation omitted). Unlike the objective standard under section 1983, North Carolina's public-official-immunity analysis examines the officer's subjective state of mind. See Andrews, 144 N.C. App. at 76, 547 S.E.2d at 123; see also Alford v. Cumberland Cnty., No. 06–1569, 2007 WL 2985297, at *7 (4th Cir. Oct. 15, 2007) (unpublished).

Viewing the evidence in the light most favorable to Robinson, no rational jury could find that Officer Best acted with subjective malice as is required to overcome public-official immunity under North Carolina law. In opposition to this conclusion, Robinson argues that Officer Best demonstrated "a wanton and reckless indifference for the rights of others because he could have seriously injured or even killed Robinson by his actions." [D.E. 46] 17. Officer Best's bodycam video belies this argument. Moreover, Robinson's argument fails to address Officer Best's

27

subjective state of mind, and Robinson produced no evidence that Officer Best used force for any reason other than to regain control of Robinson. See Alford, 2007 WL 2985297, at *7; Andrews, 144 N.C. App. at 76, 547 S.E.2d at 123.

Next, Robinson argues that Officer Best's malice exists because "he clearly intended to batter Mr. Robinson with the vehicle and intentionally threw Mr. Robinson head first at the SUV." [D.E. 46] 17. Viewing the evidence in light most favorable to Robinson (particularly the bodycam video), the evidence does not show that Officer Best acted with malice. Although the bodycam video shows Officer Best applying force, the record does not demonstrate Officer Best's subjective intent to injure Robinson. See Wilcox v. City of Asheville, 222 N.C. App. 285, 289, 730 S.E.2d 226, 230 (2012). If anything, the evidence shows that Officer Best did not have the subjective intent to injure Robinson. As the bodycam footage demonstrates, after Robinson and Officer Best fell to the ground, Officer Best immediately stood up and attempted to calm Robinson down and called for assistance. When assistance arrived, Officer Best informed other officers that Robinson required medical attention. See Bodycam 5:07–6:43. Even though Robinson aggressively yelled "fuck you" multiple times at Officer Best after they fell to the ground, Officer Best did not continue to apply force, attempt to aggressively restrain Robinson, or delay other officers from attending to Robinson upon arrival. See id. Instead, Officer Best attempted to diffuse the situation. See id. On this record, the court grants summary judgment to defendants on Robinson's state law claims.

E.

As for Robinson's request for punitive damages, the claim fails under North Carolina law. See N.C. Gen. Stat. § 1D-15. As for section 1983, punitive damages can only arise from conduct involving "reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987); see Smith

28

v. Wade, 461 U.S. 30, 56 (1983). Because there is no evidence that Officer Best acted with malicious intent to injure Robinson, the court grants summary judgment to defendants concerning punitive damages.

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 38]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This _30_ day of August, 2023.

JAMES C. DEVER III<br>
United States District Judge